IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| VCA CENVET, INC., | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-11-1763 |
| CHADWELL ANIMAL HOSPITAL, LLC, *et al.*, | * | |
| | * | |
| Defendants | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

**In Re:** **Defendant's Motion for Summary Judgment (ECF No. 44) [SEALED]**
**Plaintiff's Cross-motion for Summary Judgment (ECF No. 47) [SEALED]**

VCA Cenvet, Inc. ("Plaintiff") brought this suit against Chadwell Animal Hospital, LLC ("Defendant")[1] for alleged breach of contract and unjust enrichment. Now pending before the Court are cross-motions for summary judgment. The issues have been briefed and no hearing is required. Local Rule 105.6. For the reasons explained below, both motions will be HELD IN ABEYANCE and further briefing will be ordered on the question of damages.

**I.   BACKGROUND**

Plaintiff is a California corporation that provides commercial laboratory services. Defendant is a Maryland limited liability company that owns and operates a veterinary hospital in Abingdon, Maryland. In December of 2009, Plaintiff and Defendant entered into a written contract entitled Lab Services Agreement ("LSA") whereby Defendant agreed to purchase lab services exclusively from Plaintiff for a period of four years in exchange for discounted prices

---

[1] Summary judgment was previously entered in favor of a second Defendant, Dr. Keith Gold. (Order, ECF No. 32).

1

and rebates. Specifically, Plaintiff agreed that if Defendant used its services exclusively and purchased at least $78,000 worth of services per year (or $6,500 per month), it would issue Defendant a "loyalty rebate" equal to 17% of its purchases each month. The relevant provisions of the LSA are as follows:

> **MINIMUM AVERAGE ANNUAL FEE:** Animal Hospital Owner is required to utilize Antech to provide Laboratory Services required by Animal Hospital in an amount equal to a minimum of $78,000 or $6,500 net per month (the **"Minimum Average Annual Fee"**), in accordance with the provisions of Section 1 below.
>
> **LOYALTY COMMITMENT**  As an incentive to enter into this Agreement, Antech will rebate to Animal Hospital Owner a monthly amount as outlined in Annex #2 (the **"Loyalty Rebate"**). The Loyalty Rebate will be subject to the terms and conditions set forth in Section 3.
>
> …
>
> **1.    Exclusive Laboratory Services Provider.**
>
> 1.1    During the Term, Animal Hospital Owner shall cause all veterinary diagnostic and clinical laboratory services (**"Laboratory Services"**) that are to be performed for and on behalf of the Animal Hospital, to be performed by a veterinary diagnostic laboratory owned by Antech (an **"Antech Lab"**).
>
> …
>
> **3.    Terms and Conditions of Rebate.**
>
> 3.1    <u>Terms of Rebate</u>.  As long as Animal Hospital Owner meets the minimum monthly volume (see **Minimum Average Annual Fee**), Antech will credit the Animal Hospital's monthly lab invoice with the rebate as set forth in Annex 2 for the term of the agreement.
>
> 3.2    <u>Default</u>.  If (i) Animal Hospital Owner breaches the exclusivity provisions set forth in section 1 hereof; or (ii) Animal Hospital Owner fails to pay invoices for Laboratory Services provider hereunder within thirty (30) days following notice thereof from Antech, then such shall constitute an event of default with respect to the Rebate. At any time after the occurrence of an event of default, Antech may declare the entire amount of the Rebates previously paid to be billable and due immediately; <u>NOTE HOWEVER</u>, IF THE Animal Hospital Owner lab volume during any month falls below the stated rebate threshold in

>   [sic], the rebate will not be apply [sic] to that month BUT that does not constitute default as long as the exclusivity provisions set forth in Section 1 are maintained. The remedies available to Antech hereunder are intended to compensate Antech for the rebate and discounts provided hereunder, which rebate and discounts would not have been provided unless Animal Hospital agreed to the Minimum Average Annual Fee requirements set forth herein, the requirements set forth in Section 1 regarding exclusivity, and the payment for Laboratory Services hereunder in a timely manner.
>   …
>   **5.    Termination.** If (i) a default occurs as described in Section 3.2, or (ii) Animal Hospital is otherwise in material breach of the terms and provisions hereof, then Antech may terminate this Agreement upon written notice to Animal Hospital Owner.

(LSA, ECF No. 47-1, Ex. 1).

In October of 2010, Defendant learned that Plaintiff was a subsidiary of the corporation VCA Antech. Defendant's principals, Drs. Keith Gold and Ruby Schaupp, did not approve of Antech's business practices with respect to acquiring animal hospitals, and decided that they therefore no longer wished to do business with Plaintiff. Accordingly, Dr. Gold met with Plaintiff's representatives to discuss terminating the contract. The parties disagree as to precisely what was said during the meeting, but it is undisputed that Defendant subsequently ceased using Plaintiff's services and entered into a contract with a different lab services provider.

In June of 2011, Plaintiff filed this suit seeking damages equal to the minimum annual fees Defendant would allegedly have been obligated to pay over the remaining term of the LSA, as well as the rebates and discounts it had already given to Defendant ($273,000.000). In the alternative, Plaintiff alleges that Defendant has been unjustly enriched and seeks restitution of the rebates and discounts ($44,844.00). Defendant concedes that it breached the LSA, but argues that the default provisions limit Plaintiff's recovery to the amount of the rebates it paid ($16,096.66).

## II.     LEGAL STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. FED. R. CIV. P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. FED. R. CIV. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III.    ANALYSIS

### A.     Defendant's Motion for Summary Judgment

Defendant concedes that it is liable to Plaintiff in damages for breach of the LSA. It moves for an award of summary judgment, however, that would limit those damages to the amount of the rebates it received while the LSA was in effect: $16,096.66. Defendant's motion will be held in abeyance pending further briefing because, as the record now stands, the Court cannot find as a matter of law that the rebates are the correct measure of Plaintiff's damages.

Defendant's argument is three-fold: first, it argues that the LSA itself provides return of the rebates and cancelation of the contract as Plaintiff's sole remedy in the event of breach; second, it argues that Plaintiff is estopped from seeking damages beyond the rebates because it allegedly told Defendant that the rebates would be its "termination fee" if it chose to abandon the LSA; and, third, it argues that awarding Plaintiff its lost profits would be unconscionable. None of these arguments is persuasive.

1.      **Exclusive Remedy**

The "exclusive remedy" argument fails because under California law, which the parties elected as the governing law for the LSA,[2] the default provision on which Defendant relies is void as a penalty. The default provision states:

> At any time after the occurrence of an event of default, Antech may declare the entire amount of the Rebates previously paid to be billable and due immediately. . . . The remedies available to Antech hereunder are intended to compensate Antech for the rebate and discounts provided hereunder, which rebate and discounts would not have been provided unless Animal Hospital agreed to the Minimum Average Annual Fee requirements set forth herein, the requirements set forth in Section 1 regarding exclusivity, and the payment for Laboratory Services hereunder in a timely manner.

(LSA at ¶ 3.2). Defendant reads this provision as a liquidated damages clause. That reading is not without some plausibility. The provision makes clear that return of the rebates after default would be a form of reliance damages; that is, compensation to Plaintiff for the cost it had incurred in performing its obligations under the LSA. Reliance damages are a familiar remedy in the law of contracts and are ordinarily awarded when a plaintiff's expectation interest, the more standard measure of damages, is too speculative or difficult to calculate. Additionally, anticipated difficulty in proving expectation damages is a common reason for parties to stipulate to a fixed sum in advance through a liquidated damages clause. Finally, although the default provision is not designated as a liquidated damages clause, this does not prevent its being construed as such. *See Marris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305, 27 Cal.Rprtr.3d 797, 802-03 (Cal. App. Ct. 4 Dist. 2005) ("to determine the legality of a provision, we examine its true function and operation, not the manner in which it is characterized in the contract."). Superficially, then, there would seem to be nothing amiss in construing the LSA's

---

[2] LSA ¶6, ECF No. 47-1, Ex. 1.

default provision as a liquidated damages clause providing that, in the event of breach, Plaintiff is entitled to receive its reliance damages.

Upon closer inspection, however, this interpretation begins to break down. First, nothing in the language of the provision suggests that it purports to describe Plaintiff's sole remedy in the event of breach. Such exclusivity might be inferred from the fact, discussed further below, that Plaintiff could not recover both its reliance damages (the rebates) and its expectation damages (lost profits). But, such an inference is belied by the fact that the default provision is phrased permissively; *i.e.*, the fact that Plaintiff "may" demand return of the rebates necessarily implies that it has the option of allowing Plaintiff to keep them, in which case it would be entitled to a different remedy. The more fundamental problem, however, is that there is no clear relationship between the amount of rebates Defendant might have received at a given point in the LSA's term and the actual damages that Plaintiff would suffer as a result of a breach. The absence of such a relationship means that in many circumstances the default provision would operate as a penalty, which precludes its being a valid liquidated damages clause. *See infra*.

Under California law, liquidated damages clauses are presumed valid and will be enforced so long as they represent "the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." *See Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal.4th 970, 977, 953 P.2d 484 (Cal. 1998) (internal quotation marks and citations omitted). However, a contractual provision that compels a defaulting party to forfeit property or contractual rights "without regard to the actual damages sustained by the party aggrieved by the breach" is considered a penalty and cannot be enforced. *Garrett v. Coast & Southern Fed. Sav. & Loan Ass'n*, 9 Cal.3d 731, 739, 511 P.2d 1197 (Cal. 1973).

Viewed in light of these standards, the default provision in the LSA clearly constitutes a penalty.  The most obvious give-away is that Plaintiff retains the right to demand return of the rebates and to terminate the contract for almost any deficiency in Defendant's performance, regardless of the amount of rebates paid and regardless of the actual loss to Plaintiff.  Specifically, Plaintiff may exercise its default option if Defendant fails to pay an invoice within 30 days or if it breaches the exclusivity provision.  The mere fact that the amount Defendant must pay is not fixed, but depends largely on how long it has performed under the contract, makes the provision arbitrary and potentially punitive.  Consider, for example, the scenario of a default by late payment.  Suppose Defendant performed for six months, meeting the minimum average fee of $6,500.  It would then have received rebates of $6,330 ($6,500 x 6 months x 0.17%).  If, after the seventh month, it took 31 days to pay its invoice, Plaintiff would be entitled to demand return of the $6,330 and terminate Defendant's right to any further performance under the contract.  In the first place, this would amount to nearly a 100% monthly interest rate, which in itself would be clearly punitive, but, more importantly, if the same scenario were to occur after a year of performance, the amount of rebates would be doubled, after a year and six months, tripled, and so on.  Yet, Plaintiff's actual loss from late payment of one month's invoice would presumably remain the same.  The same reasoning applies with respect to a breach of the exclusivity provision.  It is therefore obvious that there is no necessary correlation between the remedy available to Plaintiff in the event of a default and its actual losses.  Indeed, such a correlation would seem to be largely a matter of chance.  The default provision therefore could not possibly be the result of a "reasonable endeavor" to determine a "fair average compensation" for a breach.  Instead, the provision is patently intended to provide Plaintiff with a means of coercing Defendant's performance without regard to its own losses.

7

For these reasons, the Court holds that the default provision is void as a penalty. Accordingly, the Court must also reject Defendant's argument that that provision is the sole source of the remedies available to Plaintiff for its breach. Even if that had been the intended meaning of the LSA, which seems doubtful, the point is now moot, since the provision is unenforceable.

### 2. Estoppel

Defendant alleges that when it inquired with Plaintiff about the consequences of terminating the LSA, Plaintiff informed it that the "termination fee" would be return of the rebates, somewhere in the neighborhood of $15,000 to $16,000. It further alleges that it relied on this statement in deciding to terminate the LSA and that it would not have done so if it had known that it would also be liable for Plaintiff's lost profits. Therefore, it argues, Plaintiff should be equitably estopped from claiming any damages other than the rebates. This argument fails because the doctrine of equitable estoppel does not apply to representations regarding a party's present or future intentions. Furthermore, although the remedy of *promissory* estoppel could potentially be available given the facts alleged, Defendant has not proven the elements necessary to warrant application of that doctrine.

California law recognizes the doctrine of equitable estoppel, which "provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *People v. Castillo*, 49 Cal. 4th 145, 156 n.10, 230 P.3d 1132 (Cal. 2010) (internal quotation marks and citation omitted). Application of the doctrine, however, is limited to representations of fact and does not extend either to representations regarding matters of law, (*Park Area Neighbors v. Town of Fairfax*, 29 Cal.App.4th 1442, 35 Cal.Rptr.2d 334, 338 (Cal. Ct. App. 1 Dist. 1994)), or a

party's intentions, (4 WILLISTON ON CONTRACTS § 8:3 (4th ed.)).  Here, Defendant has not alleged that Plaintiff made any representations of material fact that influenced its decision to terminate the LSA.  Rather, Defendant's real argument is that Plaintiff's alleged representation was a promise to release it from its obligations under the LSA in exchange for a return of the rebates, which promise it now seeks to enforce.

The doctrine Defendant means to invoke is that of promissory estoppel, which allows enforcement of a promise that would otherwise be unenforceable for lack of consideration.  "The elements of a promissory estoppel claim are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3)[the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance."  *U.S. Ecology, Inc. v. State*, 129 Cal.App.4th 887, 28 Cal.Rptr.3d 894, 905 (Cal. Ct. App. 4 Dist. 2005) (internal quotation marks and citation omitted).

The facts that Defendant alleges fail to make out the most critical of these elements, the unambiguous promise.  Defendant relies primarily on the deposition testimony of two of Plaintiff's representatives, Messrs. McLean and Koch, who claim that they told Defendant that the minimum cost of terminating the LSA would be return of the rebates, which they believed were in the range of $15,000 to $16,000.  Defendant further alleges that no other figure was ever discussed and that it expected to get an invoice from Plaintiff with the exact amount of the termination fee, but that it never received one, and that only after it had signed a contract with another lab services provider did it receive a letter from Plaintiff's attorney asserting Plaintiff's right to its lost profits.  The Court sees nothing in these allegations that resembles an unambiguous promise to release Defendant from its obligations under the LSA in exchange for return of the rebates.  Rather, what Defendant describes is an informal conversation about the

possible consequences of terminating the contract that failed to produce any definite promises by either party.  The Court also cannot find that Defendant's reliance on such a conversation in making an important business decision was reasonable.  The Court therefore finds that promissory estoppel is not applicable in this case.

### 3. Unconscionability

Defendant argues that the Court should refuse to award Plaintiff its lost profits because to do so would be "unconscionable" and "grossly oppressive."  As explained further below, however, it has yet to proven what Plaintiff's lost profits are.  There is thus no way to tell at this point whether or not an award of those profits would be unconscionable.

### 4. Unjust Enrichment

Count II of the complaint asserts a claim of unjust enrichment as an alternative to breach of contract, which seeks restitution of the rebates and other "discounts" allegedly given to Defendant prior to its breach of the LSA.  Defendant seeks summary judgment on this claim on the grounds that an action for restitution cannot lie where the subject matter at issue is governed by an enforceable contract, which neither side disputes is the case here.  Defendant's reading of the law is correct.  However, as explained further below, neither party has yet adduced sufficient evidence to prove what Plaintiff's actual losses are in this case, and the availability of such evidence, from the Court's point of view, is still in question.  The Court therefore cannot foreclose the possibility that those losses might be too speculative to warrant an award of actual damages and that an alternative remedy, like reliance damages or restitution, might be more appropriate.  Thus, the Court cannot award Defendant summary judgment on Plaintiff's claim for restitution, since it is still possible that, despite the existence of an enforceable contract, Plaintiff's restitution interest may yet be the best measure of damages.

### B.   Plaintiff's Cross-motion for Summary Judgment

Plaintiff has filed a cross-motion for summary judgment in this case. However, it has not included a proposed order, and the memorandum in support of the motion is somewhat opaque as to precisely what "judgment" it would have the Court enter. The thrust of the arguments, however, is that Plaintiff should be allowed to recover both the rebates it paid to Defendant before its breach of the LSA as well as the gross amount of the minimum average annual fee that it alleges would have been due over the remainder of the LSA's term. The Court flatly rejects this argument.

The standard measure of damages for breach of contract under California law is the aggrieved party's expectation interest. *See New West Charter Middle School v. Los Angeles Unified School Dist.*, 187 Cal.App.4th 831, 844 (Cal. App. 2 Dist. 2010). "This is described as the benefit of the bargain that full performance would have brought." *Id.* (citing *Akin v. Certain Underwriters at Lloyd's London*, 140 Cal.App.4th 291, 298 (Cal. App. 4 Dist. 2006). A party's loss of expected profits can be a valid measure of expectation interest, but, like all contract damages under California law, the amount of profits expected must be proved with reasonable certainty. *See Little v. Amber Hotel Co.*, 202 Cal.App.4th 280, 305, 136 Cal.Rptr.3d 97 (Cal. App. Ct. 2 Dist. 2011). Furthermore, "[w]hen loss of anticipated profits is an element of damages, it means net and not gross profits." *Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adventists*, 14 Cal.App. 209, 92 Cal.Rptr. 111, 119 (Cal. Ct. App. 1971). This means "the gains made from sales after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed." *Id.* at 119-120 (internal quotation marks and citation omitted); *accord, Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 116 Cal.Rptr.2d 158, 169 (Cal. Ct. App. 2 Dist. 2002).

Plaintiff is therefore correct in asserting that it can recover its lost profits in this case, assuming that they can be proven with reasonable certainty. It is quite incorrect, however, in asserting that it should be awarded its expected gross revenue *plus* the rebates. In the first place, as alluded to earlier in this opinion, this would be a double recovery. Lost profits is a measure of expectation damages, which seeks to put the aggrieved party in the position it would have been in had the contract been fully performed. Here, if the contract had been fully performed, Defendant would have been entitled to retain all the rebates it received. Thus, awarding Plaintiff the rebates in addition to its lost profits would not put it in the position it would have occupied if the contract had been performed, but a significantly better one, to which it is not entitled. In the second place, the gross revenue that Plaintiff would have received over the remaining term of the LSA is not a measure of its profits. Rather its profit is only the remainder of that revenue after subtracting both its cost of performance (*i.e.* the cost of providing lab services to Defendant) and the rebates that Defendant would have earned. Thirdly, the amount of revenue Plaintiff would have received is not necessarily the minimum average annual fee. Contrary to what Plaintiff argues, the LSA does not obligate Defendant to spend the minimum fee. Rather, the minimum fee is merely the condition Defendant must fulfill in order to earn a rebate. It is entirely possible that Defendant could have performed the full four-year term of the LSA and never have paid the minimum average annual fee. It simply would not have received any rebates. The only thing Plaintiff was strictly entitled to under the LSA was four years of exclusive dealing. In exchange, Defendant was entitled to four years of lab services at an agreed upon rate, plus the option of getting a special deal (the rebates) if it did a certain volume of business (the minimum average annual fee). The volume of business that it was likely to have actually done over the remaining contract term is an element of Plaintiff's case that it will have to prove by a preponderance of the

evidence. The same is true of the cost Plaintiff would have incurred in providing the services Defendant would have ordered.

### C. Further Briefing

The findings that the Court has made to this point leave this case in an awkward posture. Because neither side has been working from a tenable legal theory, they have not submitted the evidence or arguments necessary to truly test whether there is any dispute of material fact between them that would require resolution by a jury. As indicated above, that test would require evidence as to the amount of revenue Defendant was likely to generate for Plaintiff over the remaining term of the LSA and the total cost to plaintiff of providing the lab services that that revenue would have paid for (in short, a calculation of Plaintiff's profit margin). Depending on the quality of that evidence, argument may be appropriate as to whether these elements can be proven with the requisite certainty to merit an award of damages. If that question were answered in the negative, then further argument would be needed to determine the most appropriate alternative remedy.

The Court is duty-bound to avoid the spectacle and the attendant cost of empaneling a jury only to discover afterward that there was never a material factual dispute for it to resolve. Therefore, the Court will order the parties to submit further briefing on the question of damages. Specifically, their memoranda are to address the following questions: (1) what evidence is contained in the record with respect to the probable gross revenue that Defendant would likely have generated under the terms of LSA after its breach; (2) what evidence is contained in the record with respect to Plaintiff's probable profit margin on revenue generated under the LSA? (3) is the evidence described in the preceding questions sufficient to prove Plaintiff's lost profits with the level of certainty required under California law? (4) if so, what are those profits? and,

(5) if not, then what does California law prescribe as the alternative measure of damages or other remedy. The Court emphasizes that these additional arguments must be made from and supported by the record as it now exists - - discovery in this case is closed (see ECF No. 42) and will not be reopened.

## IV. ORDER

Accordingly, it is ORDERED that

(1) Defendant's Motion for Summary Judgment (ECF No. 44) and Plaintiff's Cross-motion for Summary Judgment (ECF No. 47) are HELD IN ABEYANCE;

(2) Plaintiff shall have fifteen days from the date of entry of this order to file a supplemental memorandum of law addressing the issues set out in the "Further Briefing" section of this opinion;

(3) Defendant shall have ten days from the filing of Plaintiff's supplemental memorandum to file a response;

(4) This memorandum and order are temporarily sealed; and,

(5) This memorandum and order will be unsealed ten days from the date of their issue unless the Court receives a motion to make the seal permanent.

Dated this 10th day of September, 2012

BY THE COURT:

/s/
James K. Bredar
United States District Judge