IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>VCA CENVET, INC.,</td><td>*</td><td></td></tr>
<tr><td>   Plaintiff</td><td>*</td><td></td></tr>
<tr><td>   v.</td><td>*</td><td>CIVIL NO.  JKB-11-1763</td></tr>
<tr><td>CHADWELL ANIMAL HOSPITAL, LLC,<br><i>et al.</i>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>   Defendants</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

VCA Cenvet, Inc. ("Plaintiff") brought this suit against Chadwell Animal Hospital, LLC ("Defendant")[1] for alleged breach of contract and unjust enrichment.  Now pending before the Court are Defendant's motion for summary judgment (ECF No. 44) and Plaintiff's cross-motion for summary judgment (ECF No. 47).  The issues have been briefed and no hearing is required. Local Rule 105.6.  For the reasons explained below, Defendant's motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED.

### I.     BACKGROUND

Plaintiff is a California corporation that provides commercial laboratory services. Defendant is a Maryland limited liability company that owns and operates a veterinary hospital in Abingdon, Maryland.  In December 2009, Plaintiff and Defendant entered into a written contract entitled Lab Services Agreement ("LSA") whereby Defendant agreed to purchase lab services exclusively from Plaintiff for a period of four years in exchange for discounted prices and rebates.  Specifically, Plaintiff agreed that if Defendant used its services exclusively and

---

[1] Summary judgment was previously entered in favor of a second Defendant, Dr. Keith Gold.  (Order, ECF No. 32).

purchased at least $6,500 worth of services per month, it would issue Defendant a "loyalty rebate" equal to 17% of its purchases each month. The relevant provisions of the LSA are as follows:

**MINIMUM AVERAGE ANNUAL FEE:** Animal Hospital Owner is required to utilize Antech to provide Laboratory Services required by Animal Hospital in an amount equal to a minimum of $78,000 or $6,500 net per month (the **"Minimum Average Annual Fee"**), in accordance with the provisions of Section 1 below.

**LOYALTY COMMITMENT** As an incentive to enter into this Agreement, Antech will rebate to Animal Hospital Owner a monthly amount as outlined in Annex #2 (the **"Loyalty Rebate"**). The Loyalty Rebate will be subject to the terms and conditions set forth in Section 3.

…

1. **Exclusive Laboratory Services Provider.**

1.1 During the Term, Animal Hospital Owner shall cause all veterinary diagnostic and clinical laboratory services (**"Laboratory Services"**) that are to be performed for and on behalf of the Animal Hospital, to be performed by a veterinary diagnostic laboratory owned by Antech (an **"Antech Lab"**).

…

3. **Terms and Conditions of Rebate.**

3.1 <u>Terms of Rebate</u>. As long as Animal Hospital Owner meets the minimum monthly volume (see **Minimum Average Annual Fee**), Antech will credit the Animal Hospital's monthly lab invoice with the rebate as set forth in Annex 2 for the term of the agreement.

3.2 <u>Default</u>. If (i) Animal Hospital Owner breaches the exclusivity provisions set forth in section 1 hereof; or (ii) Animal Hospital Owner fails to pay invoices for Laboratory Services provider hereunder within thirty (30) days following notice thereof from Antech, then such shall constitute an event of default with respect to the Rebate. At any time after the occurrence of an event of default, Antech may declare the entire amount of the Rebates previously paid to be billable and due immediately; <u>NOTE HOWEVER</u>, IF THE Animal Hospital Owner lab volume during any month falls below the stated rebate threshold in [sic], the rebate will not be apply [sic] to that month BUT that does not constitute default as long as the exclusivity provisions set forth in Section 1 are maintained.

2

> The remedies available to Antech hereunder are intended to compensate Antech for the rebate and discounts provided hereunder, which rebate and discounts would not have been provided unless Animal Hospital agreed to the Minimum Average Annual Fee requirements set forth herein, the requirements set forth in Section 1 regarding exclusivity, and the payment for Laboratory Services hereunder in a timely manner.
>
> …
>
> **5.    Termination.**  If (i) a default occurs as described in Section 3.2, or (ii) Animal Hospital is otherwise in material breach of the terms and provisions hereof, then Antech may terminate this Agreement upon written notice to Animal Hospital Owner.
>
> …
>
> **LABORATORY SERVICES FEE SCHEDULE**
>
> 1.  ANIMAL HOSPITAL WILL STAY ON THE SAME PRICING SCHEDULE AND HAVE SAME SPECIAL PRICING THAT THE ANIMAL HOSPITAL HAD THE DAY PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT.
>
> 2.  ANIMAL HOSPITAL WILL RECEIVE PRICING INCREASES AT THE SAME TIME THAT ANTECH INCREASES ITS PRICING TO ITS CURRENT ANTECH UNITED STATES FEE SCHEDULE.
> …

(LSA, ECF No. 47-1.)  In October 2010, Plaintiff breached the LSA and entered into a contract with a different lab services provider.

In June 2011, Plaintiff filed this suit seeking damages equal to the minimum annual fees Defendant would allegedly have been obligated to pay over the remaining term of the LSA, as well as the rebates and discounts it had already given to Defendant ($273,000.000).   In the alternative, Plaintiff alleged that Defendant has been unjustly enriched and sought restitution of the rebates and discounts ($44,844.00).   Defendant conceded that it breached the LSA, but argued that damages should be limited to the amount of the rebates it paid ($16,096.66).

On September 11, 2012, the Court issued a memorandum opinion outlining the deficiencies of the parties' first round of briefs, holding both motions in abeyance and ordering further briefing on the question of damages.  (ECF No. 57.)  On December 21, 2012, the Court ordered the parties to address the issue of mitigation of damages in a second round of supplemental briefing.  (ECF No. 64.)

## II.   LEGAL STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. FED. R. CIV. P. 56(e)(2).  To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. FED. R. CIV. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III.   ANALYSIS

As the Court noted in its previous opinion (ECF No. 57), Plaintiff's motion for summary judgment did not include a proposed order, and the memorandum in support of the motion is somewhat opaque as to precisely what "judgment" it would have the Court enter.  Based on Plaintiff's supplemental memoranda, the Court understands Plaintiff to seek an order granting summary judgment in its favor and granting damages in the amount of its lost profits ($198,644.00).  For its part, Defendant concedes that it is liable to Plaintiff in damages for breach

of the LSA, but seeks to limit those damages to the amount of the rebates it received while the LSA was in effect ($16,096.66).

The standard measure of damages for breach of contract under California law is the aggrieved party's expectation interest.[2]  *See New W. Charter Middle Sch. v. L.A. Unified Sch. Dist.*, 114 Cal. Rptr. 3d 504, 515 (Cal. Ct. App. 2010).  "This is described as the benefit of the bargain that full performance would have brought."  *Id.* (citing *Akin v. Certain Underwriters at Lloyd's London*, 44 Cal. Rptr. 3d 284, 288 (Cal. Ct. App. 2006).  As a general principle, "damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent."  *Grupe v. Glick*, 160 P.2d 832, 840 (Cal. 1945).  "[O]nce their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision."  *Resort Video, Ltd. v. Laser Video, Inc.*, 42 Cal. Rptr. 2d 136, 146 (Cal. Ct. App. 1995) (quoting *Berge v. Int'l Harvester Co.*, 190 Cal. Rptr. 815, 822 (Cal. Ct. App. 1983)).

However, recovery must be limited to net profits, because "[t]o allow [P]laintiff to recover a judgment based in part on [its] gross profits would result in [its] unjust enrichment."  *Gerwin v. Se. Cal. Ass'n of Seventh Day Adventists*, 92 Cal. Rptr. 111, 119 (Cal. Ct. App. 1971) (internal citations omitted).  Therefore, Plaintiff cannot recover lost profits if the evidence on the record establishes "the possibility of loss of gross revenue, not the loss of any net pecuniary gain."  *Resort Video*, 42 Cal. Rptr. 2d at 148.  Any award of lost profits on the basis of such evidence would be "too speculative to meet the legal standard of reasonable certainty necessary to support an award of such damage[s]."  *Gerwin*, 92 Cal. Rptr. at 118.

Plaintiff has not offered sufficient evidence to establish the occurrence and extent of its lost profits with reasonable certainty, because Plaintiff has not offered evidence of the cost of its

---

[2] The LSA is governed by California law.  (LSA ¶ 6.)

performance of services for Defendant under the LSA.  Plaintiff attempts to establish its net profits by applying its variable cost rate to its projected revenue under the LSA.[3]  A variable cost is "a cost that fluctuates depending on revenue," and Plaintiff defines this category of costs to include "lab supplies, client supplies, send out testing fees, royalty fees, transportation, and sales [and] marketing fees."  (Pl. First Supp. Br. at 6, Ex. 5; ECF No. 59.)  Unfortunately, Plaintiff has offered no evidence of the actual costs it incurred performing services for Defendant under the LSA (or even its usual profit margin in connection with the type of lab services it performed for Defendant).  Instead, Plaintiff suggests that the Court apply its estimated company-wide variable cost rate of 29% to its projected revenues.  (*Id.* at 3, 6, Ex. 1.)[4]  This attempt to estimate Plaintiff's expenses in connection with performance of services for Defendant under the LSA fails for two reasons.

First, Plaintiff has offered no basis for, or evidence to support, its assumption that its company-wide variable cost rate approximates the costs it incurred performing services for Defendant under the LSA.  The Court has no information based on which it could determine that Plaintiff's profit margin on services performed for Defendant under the LSA is similar to its profit margin on the goods or services it provides to its other customers.  It is possible that Plaintiff makes a large profit for performing certain services while making little or no profit for performing other services.  In fact, as described more fully below, Defendant paid discounted fees for the services it received under the LSA, which suggests that Plaintiff's profit margin on services it performed for Defendant may be smaller than its company-wide profit margin.  The

---

[3] Plaintiff *has* offered sufficient evidence from which a reasonable jury could establish its lost revenue with reasonable certainty, but that without more does not create a genuine issue of material fact on the overall question and element of damages,  as explained *supra*.

[4] *See also* Pl. First Supp. Br. Ex. 2 ("Bargmann Dep. Tr.") at 29:8-14 ("So there was lab supplies, client supplies, those tests that we send out to other labs . . . certain pathology fees, royalties and transportation, and then sales and marketing expenses we classified as variable.  And whatever percentage that was of overall revenue, it equated to 28.9 percent in 2010.").

reason that California courts are more willing to award lost profits to an established business than a new business is that in the former case the damages "may be ascertained with reasonable certainty from the past volume of business *and other provable data* relevant to the probable future sales." *Grupe*, 26 Cal. at 692 (emphasis added). This provable data must reflect both historical revenue and expenses; without evidence of Plaintiff's expenses, a projection of its lost profits is just as speculative as the projection of a new business's lost profits.

Plaintiff relies heavily on *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 93 Cal. Rptr. 2d 364 (Cal. Ct. App. 2000), to support its methodology for calculating its expectation interest. However, in *Shade Foods*, the plaintiff offered evidence of the historical income and expenses of the business for which it sought to recover lost profits. *See id.* at 394 ("the company's income *and expense statement* for the first three months of 1994 provided a reasonable basis for" calculating damages (emphasis added)). The same is true of *Sanchez-Correa v. Bank of America*, 38 Cal. 3d 892, 908 (Cal. 1985), in which the Supreme Court of California upheld an award of lost profits as supported by substantial evidence. The court relied in part on future growth analysis by plaintiff's financial advisor and comparisons to other similar companies' earnings, but the court also emphasized that the projections were supported by evidence of the historical growth and performance of the business at issue in the case. *Id.* Plaintiff has offered no evidence of the actual expenses it incurred performing services for Defendant under the LSA, and no evidence or reasoning to support its assumption that its company-wide variable cost rate is a reasonably certain means of estimating of those expenses.

Second, Plaintiff has not offered sufficient information to substantiate its assertion that its company-wide variable cost rate is approximately 29% of revenue. Plaintiff has provided only the barest of definitions for the terms "fixed cost" and "variable cost," and very limited

7

explanations of the categories of costs that it sorted into each bucket.  (*See* Bargmann Dep. Tr. at 29:2-7 ("So we identified certain line items that would fall into a variability.  And if they had an element of variability, it doesn't mean their whole classification was variable, but we didn't make the – we didn't try to split up between what was fixed of that and what was variable, we classified that whole category as variable.").)  The Court has no reason to doubt that Plaintiff acted in good faith when it attempted to categorize its costs, but Plaintiff has provided almost no insight into its decision-making process.  More importantly, Plaintiff has offered only summary charts reflecting its final cost calculations without sharing any of the underlying data.  (*See* Pl. First Supp. Br. Exs. 1, 6.; ECF Nos. 59-1, 59-6.)  Plaintiff is required to provide evidence and analysis to justify its proposed variable cost calculation; merely asserting that variable costs are approximately 29% of revenue is insufficient.[5]

In summary, Plaintiff has offered: (1) no direct evidence of its expenses in performing services for Defendant under the LSA, or even its usual profit margin in connection with the type of lab services it performed for Defendant under the LSA; (2) no evidence to support the assumption that its company-wide variable costs are comparable to the cost of its performance under the LSA; and (3) very little evidence to support its assertion that its company-wide variable costs are approximately 29% of revenue.  Without any of these categories of evidence, Plaintiff has failed to establish both the occurrence and the extent of its lost profits with reasonable certainty, and an award of expectation damages could therefore result in its unjust enrichment.  *See Gerwin*, 92 Cal. Rptr. at 119.

---

[5] To the extent that Plaintiff attempts to rely on the data in the SEC filings that it attached as exhibits to its brief, the Court notes that these filings are annual reports filed by VCA Antech, Plaintiff's corporate parent.  Plaintiff has offered no argument to support applying information about the variable cost rate of Plaintiff's corporate parent to Plaintiff's revenues under the LSA with Defendant.

Finally, even if Plaintiff had established that Defendant's breach caused it to lose anticipated profits of $198,644.00, the Court would find such an award of damages in this case to be unconscionable.  Under California law, "where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered."  CAL. CIV. CODE § 3359; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981) ("A court may limit damages for foreseeable loss by excluding recovery for loss of profits . . . if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.").  The practical effect of an award of the claimed lost profits in this case would be to require Defendant to pay twice for all of its lab testing requirements for a three-year period—once to compensate the replacement company that performs the tests and once to compensate Plaintiff for its lost profits.  In addition, such a judgment would award Plaintiff nearly $200,000 as compensation for *not performing any services*.  In light of the facts of this case—including that the breach occurred with three years remaining on the contractual term, and Plaintiff's total lack of detrimental reliance due to the non-exclusive (from Plaintiff's perspective, *see* Pl. Second Supp. Br. at 2, ECF No. 68)  nature of the contract—that result would be grossly oppressive to Defendant and result in disproportionate compensation for Plaintiff.[6]

Therefore, the Court will not award Plaintiff damages in the amount of its claimed lost profits.  The Court will award Plaintiff its restitution interest.  Defendant should not be allowed to benefit as a result of the contract that it breached, and Plaintiff is entitled to recover any

---

[6] The Court recognizes that the concerns it raises are not unique to this case—in fact, they are the natural consequences of allowing plaintiffs to seek lost profits for breaches of requirements contracts like this one.  The Court does not hold that Defendant could not recover some reasonable portion of its lost profits if it offered sufficient evidence to establish their occurrence and extent with reasonable certainty.  If Plaintiff had presented that evidence, it is likely that Plaintiff could have established that an award of some of its lost profits would be reasonable.  However, in light of the rulings above, the Court need not engage in the fact-intensive analysis to determine the exact amount of damages that would be reasonable in such case.

benefit wrongfully conferred on Defendant in exchange for Defendant's promise of a four-year contractual term.  Plaintiff argues that it is entitled to restitution of both the rebates and certain fee discounts encompassed in the agreement.  There is no dispute as to the rebates; they must be repaid.  However, the undisputed evidence in the record demonstrates that Defendant received the *same* discounts before the LSA went into effect, and the discounted rates were not a benefit that Plaintiff conferred on Defendant in exchange for Defendant's promise of a four-year contractual term.[7]  Therefore, Plaintiff is entitled to recover the rebates it paid to Defendant under the terms of the LSA ($16,096.66), but not the discounts.

In light of these rulings, Plaintiff's claim for unjust enrichment will be dismissed.  *See Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 700-01 (Cal. Ct. App. 2010) (under California law, an unjust enrichment theory is inapplicable where the parties have an enforceable express contract); *Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. 2008) (under Maryland law, a claim of unjust enrichment "may not be brought where the subject matter of the claim is covered by an express contract between the parties").

## IV.    CONCLUSION

Accordingly, an order shall issue GRANTING Defendant's motion for summary judgment (ECF No. 44) and DENYING Plaintiff's cross-motion for summary judgment (ECF No. 47).

---

[7] *See* LSA, Annex 1 ("[DEFENDANT] WILL STAY ON THE SAME PRICING SCHEDULE AND HAVE SAME [*sic*] SPECIAL PRICING THAT [DEFENDANT] HAD THE DAY PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT.").

Dated this 22nd day of February, 2013

BY THE COURT:


_____/s/_____
James K. Bredar
United States District Judge